IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARGARET WILTON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 14 C 7896 |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| AMEDISYS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Margaret Wilton has brought a three-count complaint against her former employer defendant Amedisys Holding, LLC alleging discrimination (Count I), failure to accommodate (Count II), and retaliation (Count III) in violation of the Americans with Disabilities Act ("ADA"), as amended by the ADA Amendments Act of 2008 ("ADAAA"), 42 U.S.C. §§ 12101 et seq. Defendant has moved for summary judgment on all counts. For the reasons discussed below, defendant's motion is denied.

## BACKGROUND[1]

Defendant is a home health care company that provides health and hospice care to patients throughout the United States. Plaintiff, a registered nurse, began working for defendant in August 2009. In January 2010 defendant promoted plaintiff to Director of Operations ("DOO") of its Naperville, Illinois Care Center ("NCC"). She held this position until she was fired on June 28, 2013. She was the NCC's highest-ranking day-to-day employee with responsibilities for the NCC's financial and overall performance and managing its clinical and administrative staff. In 2011 she was named her area's

---

[1] The following facts are, unless otherwise specified, undisputed and come from the parties' Local Rule ("L.R.") 56.1 statements and responses.

1

Director of the Year.  In 2012 the NCC received defendant's Distinguished Care Center Award.

Plaintiff was diagnosed with lupus in 2007.[2]  Lupus is a "chronic autoimmune disease where the immune system attacks a person's tissues, causing inflammation, swelling, pain, and damage."  Symptoms include "profound fatigue, severe joint pain, muscle aches, arthritis, headaches, and mouth and scalp sores."  Plaintiff claims that in addition to substantially limiting her ability to drive and concentrate, these symptoms also "leave her so fatigued that at times she is unable to work."

In early 2013, at defendant's request, while maintaining her position as the NCC's DOO, plaintiff began traveling to and covering several Midwest care centers.  Plaintiff eventually became the Interim DOO ("IDOO") of the Indianapolis Care Center ("ICC") in April 2013.  Plaintiff claims that because of her lupus she needed to travel during normal business hours to ensure that she had enough time to rest in the evenings.  This was an extension of permitting her to leave work early if her lupus flared up.  Plaintiff worked half days on the days that she traveled between the care centers.  According to plaintiff, her supervisor at the time, Regional Vice President Sheryl Holdren ("Holdren"), approved the accommodation.  Holdren, however, claims that this was a common practice for DOOs covering multiple care centers.

---

[2] Although plaintiff submitted only two sparse documents supporting her diagnosis, defendant has not challenged it.  The first is an email from October 12, 2011, stating, "My Lupus is ready [sic.] the last two days. I am going to try to make it through the day today. I will let you know if I have to go home. Sorry thinks [sic.] I can work from home on the referral project. OK."  The second is an FMLA request form that stated that one of the reasons she needed time off was related to lupus (estimated time was November 1, 2010, to January 1, 2011).

2

Plaintiff's problems began in May 2013 when Judith Miner ("Miner") replaced Holdren as plaintiff's supervisor. After Miner's promotion, but before Holdren's departure, plaintiff met with Holdren, Miner, and Miner's supervisor, Interim Vice President of Operations Tammy Peebles-Forrest ("Forrest"). Plaintiff claims that she told the group that she had lupus and asked to keep her current travel schedule "so that she could rest at night." According to plaintiff, they all agreed to her maintaining her schedule, but Miner and Forrest do not remember plaintiff mentioning lupus or requesting an accommodation. Plaintiff claims that Miner's body language showed that she was "hostil[e] toward the idea of accommodating [p]laintiff."

In early June 2013 during plaintiff's first meeting with Miner as her supervisor, Miner ordered plaintiff to change her schedule so that each week she would work at the ICC two full days and NCC three full days. Plaintiff claims that she objected because her lupus physically prevented her from working the proposed schedule. Miner told plaintiff that she would discuss the matter with Forrest.

Plaintiff did not have any further contact with Miner until Miner called plaintiff several days later while plaintiff was at the ICC to demand that plaintiff be at the NCC the following day at 8:00 AM. Plaintiff complained directly to Forrest about Miner and reiterated her need to maintain her travel schedule. Forrest, however, told plaintiff that she had to do what Miner said. This was too much for plaintiff, so she resigned as IDOO.

On June 20, 2013, Miner received several complaints from Kathy Benco ("Benco") and Emil Ballano ("Ballano")[3] relating to the NCC. Defendant claims that the complaints, in part, alleged that plaintiff retaliated against NCC employees and set

---

[3] The parties disagree about whether Miner solicited these complaints.

3

"summer hours" (8:00 A.M. to 4:30 P.M., instead of 5:00 P.M.) for the NCC. Ballano does not remember telling Miner this and claims that he did not experience any retaliation. Miner reported these concerns to Forrest. According to Forrest, these complaints along with the resignation of Tammy Patterson ("Patterson"), a former NCC employee, on June 20, 2013, caused Forrest and Laura Eha ("Eha"), the Senior Vice President of Operations, to travel to and investigate the NCC.

When Patterson resigned she submitted a letter explaining her frustration with "the lack of communication between the [NCC's] management and staff." The letter mentioned Patterson's issues with Benco and Benco's scheduling practices. Defendant claims that plaintiff's superiors saw Patterson's complaints as indictments of plaintiff's leadership because plaintiff was ultimately responsible for the NCC's internal workings.

Forrest and Eha conducted their one-day investigation at the NCC on June 26, 2013. They initially planned on interviewing nine specific employees, but once they arrived at the NCC, they decided to interview whomever was around. This led to interviews with Ballano, Tracey Elkins, and Benco.

After completing their investigation Eha and Forrest created a Performance Improvement Plan ("PIP") with T. Terrill West's ("West") assistance. At the time he was defendant's Diversity Officer and Manager of HR Governance, Compliance, and Diversity. The following day on June 27, 2013, defendant placed plaintiff on the PIP, and issued her a Final Written Warning. Although plaintiff claims that she had a spotless record, West claims that he investigated plaintiff in March 2013 for "harassment and

retaliation," but found no evidence of it.[4]  Plaintiff was issued a verbal warning that she does not remember receiving.  Although defendant claims to have considered the investigation and verbal warning in issuing the PIP and terminating plaintiff, neither were mentioned in the PIP, West's conversations with plaintiff after her firing, defendant's initial position statement to the EEOC ("Position Statement"), or its interrogatory responses.  They were mentioned for the first time during West's deposition.

The PIP, in part, required plaintiff to "improve her responsiveness and accountability in responding to staff issues . . . not leav[e] work early (8:00 a.m. to 5:00 p.m.) . . . [and] immediately [stop] speaking with clinical staff, referral sources, or other personnel on speaker phone unless all parties are aware and agree."  Plaintiff did not ask any questions when she signed the PIP, but the PIP's disclaimer stated "[s]ignature on this document is an acknowledgment that this form has been provided to you, and does not necessarily imply agreement with the corrective action plan."

After this meeting plaintiff returned to her office and called West to complain about the manner in which the investigation was conducted.  Plaintiff initially tried to use her speakerphone during the call because her headset was broken.  West, however, asked to be taken off of speakerphone, and insisted on it even after plaintiff explained that her headset was broken.  Plaintiff complied and proceeded to complain about being disciplined for requesting an accommodation and the inaccuracy of the counseling form.  According to plaintiff, West was "dismissive" and "told her to put it in writing."  After

---

[4] The court notes that the Verbal Counseling Form indicates that West's counseling session with plaintiff allegedly occurred on March 14, 2013, but the problematic behavior purportedly occurred more than eight months earlier.

5

the call, plaintiff asked Miner if she could leave early to attend a tasting for her daughter's wedding, but Miner rejected the request.

Later that same day, plaintiff sent West a patient complaint that the NCC had received on June 25, 2013. The final reason given to plaintiff for her termination relates to this complaint, but the exact issues raised by the complaint have changed over the course of this litigation. Initially, plaintiff was accused of not investigating the complaint, and not being able to provide West any details about the complaint. In his deposition, West claimed, for the first time, that the real issue was that plaintiff had not read the complaint for over 24 hours. Defendant now claims that plaintiff's failure to respond to this complaint in a "timely fashion" was the third violation of the PIP in less than 24 hours. Neither Eha nor Forrest could point to a company policy on timeliness. Additionally, the first page of the complaint notes that the situation had been handled on June 25, 2013, the day that it was filed. Eha also testified that she believed that the PIP was not supposed to apply retroactively.

Until West's deposition these were the only reasons given for plaintiff's termination. A new reason, however, was added during West's deposition when he claimed that his June 27, 2013, conversation with Patterson raised serious retaliation concerns. According to West, plaintiff had received a verbal warning earlier in 2013 for retaliating against certain subordinates. West stated that his conversation with Patterson was the final factor in defendant's decision to fire plaintiff. This contradicts defendant's previous statements to plaintiff, the EEOC, and its initial interrogatory responses when it stated that the three reasons stated above were the basis for plaintiff's termination. Further, when West updated Forrest and Eha on June 27, 2013, with plaintiff's alleged

6

disregard of the PIP, he mentioned only the three previously stated reasons and nothing about retaliation or any other concern raised by his conversation with Patterson.

After plaintiff was fired on June 28, 2013, West spoke with her again on July 3, 2013, and explained to her that she was fired for the three previously mentioned reasons. Defendant claims that the Patterson conversation and previous investigation were not mentioned earlier because of an "oversight."

Plaintiff filed her Equal Employment Opportunity Commission ("EEOC") Charge of Discrimination on or about January 24, 2014. Defendant submitted the Position Statement on March 11, 2014. When listing the reasons for plaintiff's firing, defendant listed the three reasons conveyed to plaintiff, and nothing about West's conversation with Patterson or retaliation. There was, however, a footnote that the responses were preliminary and that there was an ongoing investigation. On July 21, 2014, the EEOC provided plaintiff with her Right-to-Sue-Letter.

## DISCUSSION[5]

**I.    Legal Standard**

A movant is entitled to summary judgment pursuant to Fed. R. Civ. P. 56 when the moving papers and affidavits show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once a moving party has met its burden, the nonmoving party must go beyond the pleadings and set forth specific facts showing there is a genuine issue for trial. See Fed. R. Civ. P. 56(c); Becker v. Tenenbaum-Hill Assoc.,

---

[5] In its reply, defendant asks the court to strike a number of plaintiff's L.R. 56.1 responses for violating this court's local rules. To the extent that any of plaintiff's relevant statements of fact offend this court's local rules, the court will not consider them. See Gittings v. Tredegar Corp., 2010 WL 4930998, at *1 n.4 (N.D. Ill. 2010).

Inc., 914 F.2d 107, 110 (7th Cir. 1990). The court considers the record as a whole and draws all reasonable inferences in the light most favorable to the nonmoving party. See Green v. Carlson, 826 F.2d 647, 651 (7th Cir. 1987).

A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The nonmoving party must, however, "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." Anderson, 477 U.S. at 252.

**II. Analysis**

**A. Qualifying Disability**

As a threshold matter, defendant argues that plaintiff's claims fail because she is not a qualified individual with a disability. Defendant, however, relies on outdated precedent that does not incorporate the ADAAA, which was enacted on January 1, 2009, with the purpose of setting a broader definition of what constitutes a disability. PL 110–325, Sept. 25, 2008, 122 Stat 3553.

The parties expend a significant portion of their briefs debating whether lupus qualifies as a disability. Both parties incorrectly, and inexcusably, focus on the definition of "Major Life Activities In General" in 42 U.S.C. § 12102(2)(A), instead of the definition of "Major Bodily Functions" in 42 U.S.C. § 12102(2)(B). It provides that "a major life activity also includes the operations of a major bodily function, including . . .

8

functions of the immune system." 42 U.S.C. § 12102(2)(B). Lupus is an autoimmune disease, i.e., a disease that attacks the immune system. Consequently, plaintiff has a qualifying disability for the purposes of this motion.

### B. Failure to Accommodate

Plaintiff claims that defendant refused to accommodate her disability in violation of the ADA. To maintain an ADA failure to accommodate claim, an employee "must show: (1) [s]he is a qualified individual with a disability; (2) the employer was aware of [the] disability; and (3) the employer failed to reasonably accommodate the disability." Curtis v. Costco Wholesale Corp., 807 F.3d 215, 224 (7th Cir. 2015) (internal citations omitted). The only element in question is whether defendant failed to provide a reasonable accommodation for plaintiff's disability. First, as previously stated, plaintiff is a qualified individual with a disability for the purposes of this motion. Second, defendant does not dispute, for the purposes of this motion, that plaintiff told all of her relevant superiors that she had lupus. Third, defendant argues that plaintiff's claim fails because she never submitted any medical paperwork detailing her medical needs.

The crux of the matter is whether plaintiff's verbal requests for an accommodation were enough to make defendant aware of her disability and medically necessary accommodations. Under the ADA, an employer is required to accommodate "known physical or mental limitations" of an employee. 42 U.S.C. § 12112(b)(5)(A). It is initially the employee's burden to inform the employer of her disability. Beck v. Univ. of Wisconsin Bd. of Regents, 75 F.3d 1130, 1134 (7th Cir. 1996).

Employers and employees may engage in an interactive process to determine "the precise limitations resulting from the disability and potential reasonable accommodations

that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3). If there is a breakdown in the process, the employee must demonstrate that she attempted to engage in the process, and that the employer was responsible for the breakdown. Ekstrand v. School Dist. of Somerset, 583 F.3d 972, 975-76 (7th Cir. 2009). The ADA requires only that the employer base its accommodation on the employee's precise limitations. Id. at 976. The employer is not obligated to provide a specific accommodation request until the employee has made the employer aware of her disability, and even then the employer is obligated to provide a reasonable accommodation only, not necessarily the one the employee requests. Bunn v. Khoury Enterprises, Inc., 753 F.3d 676, 683 (7th Cir. 2014).

Defendant contends that as in cases such as Hoppe v. Lewis Univ., 692 F.3d 833, 840 (7th Cir. 2012) and Ekstrand, 583 F.3d at 976, plaintiff failed to meet her burden because she did not present defendant with any medical documentation detailing her specific limitations and medically necessary accommodations. These cases are inapposite, however, because in each case the employee was requesting new accommodations without having fully informed the employer of the nature of the disability or the reason the disability required the accommodation. Hoppe, 692 F.3d at 837-38; Ekstrand, 583 F.3d at 976-77.

In the instant case however, there are disputed issues of fact regarding whether plaintiff informed defendant of her need for an accommodation (she contends she did and that defendant accepted the fact) and had previously received the accommodation she claims defendant took away. Drawing all reasonable inferences in plaintiff's favor, a reasonable trier of fact could find that defendant's prior acceptance of the fact that plaintiff had a disability and required the accommodation plaintiff sought, relieved

10

plaintiff of any obligation to provide additional information such as medical documentation. Consequently, defendant's motion is denied as to Count II.[6]

### B. Discrimination Claim

Plaintiff also claims that she suffered multiple adverse employment actions in violation of the ADA. A plaintiff claiming disparate treatment in violation of the ADA can rely on either the direct or indirect method of proof to survive a motion for summary judgment. Bunn, 753 F.3d at 683. Plaintiff argues that she can succeed under either method.[7] Plaintiff must show under the direct method that a genuine issue of material fact exists with respect to each of the three elements that she must eventually prove at trial: (1) that she has a disability within the meaning of the ADA; (2) that she is qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) that she has suffered an adverse employment action because of her disability. Id.

Defendant contests the first and third elements. The court, however, has already ruled that plaintiff's lupus qualifies as a disability for the purposes of this motion. Defendant argues that plaintiff cannot show a question of fact as to whether she suffered an adverse employment action because of her disability. The court disagrees.

Under the direct method plaintiff may rely on either direct or circumstantial evidence to tie the alleged adverse action to a discriminatory animus. Id. at 683-84. Direct evidence, such as an admission of discriminatory intent by the relevant decision-

---

[6] The court is unclear, however, as to what damages, unique to this claim, plaintiff has suffered.

[7] The indirect method follows the McDonnell Douglas Corp v. Green, 411 U.S. 792 (1973), burden-shifting method. Bunn, 753 F.3d at 685. As will be shown below, the court need not reach this issue because plaintiff succeeds under the direct method.

11

maker, is generally rare in ADA cases. Id. at 684. Thus, most ADA plaintiffs rely on circumstantial evidence such as (id.):

> (1) suspicious timing;
> (2) ambiguous statements or behavior toward other employees in the protected group;
> (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically received better treatment; and
> (4) evidence that the employer offered a pretextual reason for the adverse employment action.

A plaintiff may survive summary judgment by presenting "evidence [that] would permit a reasonable factfinder to conclude that the plaintiff's [disability] caused the discharge or other adverse employment action." Ortiz v. Werner Enterprises, Inc., __ F.3d ___, 2016 WL 4411434, at *4 (7th Cir. Aug. 19, 2016) ("reiterat[ing] that 'convincing mosaic' is not a legal test."). At this stage, the court must "evaluate the 'overall likelihood of discrimination,' . . . [and consider all of the evidence] together 'to understand the pattern it reveals.'" Saffold v. South Suburban Coll., 2016 WL 4429650, at *3 (N.D. Ill. 2016) (citing Ortiz, 2016 WL 4411434).

Plaintiff relies on suspicious timing and her claim that the investigation, PIP, and defendant's purported reasons for terminating her – her multiple violations of the PIP "the same day it was issued to her" (emphasis added) are pretextual.

First, it is undisputed that plaintiff was fired within 24 hours of complaining to West about the investigation, the investigation's perceived discriminatory animus, PIP, and failure to accommodate plaintiff's disability. Defendant argues that plaintiff was fired within 24 hours of receiving her PIP and Final Warning because she violated several key components of the PIP. Generally, suspicious timing is an "important evidentiary ally of the plaintiff," but it must be combined with other circumstantial evidence to create

a genuine issue of material fact. Lang v. Ill. Dept. of Children and Family Services, 361 F.3d 416, 419 (7th Cir. 2004) (internal citations omitted). As discussed below, there is a question as to whether defendant's proffered reasons for plaintiff's termination are pretextual.

The pretext inquiry focuses on whether the employer's explanation for the adverse employment action is honest, and not its validity or reasonableness. Hill v. Tangherlini, 724 F.3d 965, 968 (7th Cir. 2013). The court does not "reexamine business decisions as a super-personnel department." Mullin v. Temco Machinery, Inc., 732 F.3d 772, 778 (7th Cir. 2013). An employer's shifting or inconsistent explanations for an employment decision may permit a reasonable fact-finder to infer that the original reasons for the employment action were more invidious. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000) (holding that "in appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."); Willis v. Career Education Corporation, Corp., 2015 WL 3859191, at *11 (N.D. Ill. 2015) (holding that the defendant's constant "augmentation[s]" of its reasoning for terminating plaintiff could be viewed as shifting or inconsistent by a reasonable jury).

Defendant argues that plaintiff was fired for violating key components of her PIP. It is undisputed that until West's deposition, defendant had articulated the same three reasons for plaintiff's termination that plaintiff was given when she was terminated on June 28, 2013: leaving work early; the speakerphone provision; and concerns related to the June 25 patient complaint. Defendant now concedes that plaintiff did not violate the

PIP when she requested permission to leave work early for her daughter's wedding tasting. Defendant has also changed its rationale regarding the June 25 patient complaint.

Both parties agree that the third reason relates to the June 25 patient complaint, but disagree on what issues it raises. When West first discussed the June 25 patient complaint with plaintiff during their June 28, 2013, and July 3, 2013, conversations, he explained that she violated the PIP by failing to conduct any type of investigation into the matter and being unable to provide West with any details about the complaint. The same explanation was also given in West's June 27, 2013, email to Forrest and Eha, the Position Statement, and defendant's interrogatory responses. This explanation was replaced, however, during West's deposition with the explanation that it was inexcusable that it took plaintiff over 24 hours to read the complaint.[8]

Finally, West added a fourth reason for plaintiff's termination during his deposition when he indicated that his June 27, 2013, conversation with Patterson raised serious concerns about plaintiff retaliating against and harassing employees. According to West, this was a problem because plaintiff had previously received a verbal warning for retaliation. West now claims that the implication of retaliation was the deciding factor in his endorsing the recommendation to terminate plaintiff. Although this was the deciding factor, there was no reference to these concerns in West's conversations with plaintiff, West's email to Forrest and Eha, the Position Statement, or in defendant's interrogatory responses. Defendant's sole explanation for the belated addition of this reason is that its absence from earlier correspondence "must have been an oversight."

---

[8] When asked to define what if any policy defendant had regarding reading or responding to patient complaints, Eha and Forrest could not point to any policy.

Defendant argues that any changes are the byproducts of the evolution of its case. Defendant claims that the delayed disclosure of these new concerns about plaintiff retaliating against employees is only a clarification of its reasoning. In support, defendant relies on Silverman v. Bd. of Education of Chicago, 637 F.3d 729, 737 (7th Cir. 2011), where an employer's statements to the EEOC were clarified during a later deposition, and were not evidence of pretext. Defendant also relies on Castro v. DeVry Univ., Inc., 786 F.3d 559, 577 (7th Cir. 2015), to argue that it is not liable for failing to include each of its reasons for plaintiff's termination in "each communication about the employee." These cases, however, are inapposite.

Unlike the cases defendant relies on, here defendant abandoned one of the reasons given to plaintiff for her termination, modified a second, and added a fourth. The first reason was that she asked permission to leave work early to attend her daughter's wedding tasting. Defendant now concedes that plaintiff adhered to the PIP's requirements by asking for permission to leave early, and adhering to her supervisor's decision, even though abandoning a rationale is enough to infer pretext. Appelbaum v. Milwaukee Metropolitan Sewerage Dist., 340 F.3d 573, 579 (7th Cir. 2003) (holding that it is reasonable to infer pretext when there is a departure from the previously articulated rationale for the employee's discharge); Mullin, 732 F.3d at 778 (citing Stalter v. Wal-Mart Stores, Inc., 195 F.3d 285, 291 (7th Cir. 1999)).

Defendant's unsuccessful attempts to excuse the shifts and additions in its rationale for plaintiff's termination creates a triable issue as to the real reasons for plaintiff's termination. In defendant's internal discussion between the decision-makers, its direct communication with plaintiff, its statement to the EEOC, and in its interrogatory

responses, defendant maintained the same three reasons it told plaintiff on June 28, 2013. Further, even though it had multiple opportunities, defendant failed to identify the alleged "deciding factor" in a single communication until West's deposition.

A jury could view this as evidence of pretext, or agree with defendant that it was just an example of defendant's imperfections. Emmel v. Coca-Cola Bottling Co. of Chicago, 95 F.3d 627, 634 (7th Cir. 1996). There are questions as to the veracity of the proffered reasons for plaintiff's termination. As such, a jury could view the reasons as pretext, and when combined with the suspicious timing of plaintiff's termination, could find that plaintiff was fired because of her disability. Consequently, defendant's motion is denied as to Count I.

### C. Retaliation Claim

The ADA prohibits employers from retaliating against employees who have engaged in a protected activity. 42 U.S.C. § 12203(a). A plaintiff may pursue a retaliation claim by presenting either direct or indirect evidence.[9] Dickerson v. Bd. of Trustees of Community College Dist. No. 522, 657 F.3d 595, 601 (7th Cir. 2011). Under the direct method, a plaintiff must show: "(1) [s]he engaged in a statutorily protected activity; (2) [s]he suffered an adverse action; and (3) a causal connection between the two." Id. Employers are prohibited from retaliating against employees who raise ADA claims, whether the initial discrimination claim has merit or not. Squibb v. Mem'l Med. Ctr., 497 F.3d 775, 786 (7th Cir. 2007).

Defendant argues that plaintiff cannot show a question of fact as to whether there was a causal connection between plaintiff's protected activity and her termination.

---

[9] The court does not need to reach the indirect method because plaintiff succeeds under the direct method.

16

Plaintiff claims that the investigation, discipline, PIP, and discharge are each retaliatory actions. Because a termination constitutes an adverse employment action, the court need not reach the issue of whether the other acts constituted adverse employment actions. See e.g., Castro, 786 F.3d at 564 ("A termination is of course a materially adverse employment action.").

As with plaintiff's discrimination claim, there is no direct evidence of defendant's retaliatory motives, but plaintiff again relies on circumstantial evidence. Defendant proffers the same arguments that it marshaled against plaintiff's discrimination claim, but they meet the same fate. A jury may find a retaliatory animus from the fact that plaintiff was fired 24 hours after complaining about defendant's failure to accommodate and discrimination, as well as the questions surrounding the proffered reasons for plaintiff's termination. Peele v. Burch, 722 F.3d 956, 960 (7th Cir. 2013); Rudin v. Lincoln Land Cmty Coll., 420 F.3d 712, 726-27 (7th Cir. 2005). Consequently, defendant's motion is denied as to Count III.

## CONCLUSION

For the foregoing reasons, the court denies defendant's motion for summary judgment. The parties are ordered to appear for a status hearing on September 21, 2016, at 9:00 A.M.

**ENTER:** September 6, 2016

_____
**Robert W. Gettleman**
**United States District Judge**